# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff/Respondent,

v.           No. CV 13-0738 WJ/LAM
             CR 09-2626 WJ

NATHAN DON JACK,

   Defendant/Movant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on Defendant/Movant (hereinafter "Defendant") Nathan Don Jack's § 2255 motion [*Doc. 1*],[2] filed on August 8, 2013 requesting that his second degree murder conviction be vacated.   Plaintiff/Respondent (hereinafter "the Government") filed a response to the § 2255 motion on November 4, 2013 (*Doc. 32*), and Defendant filed a reply to the Government's response on January 17, 2014 (*Doc. 35*).[3]   Also before the Court are Defendant's motions for an evidentiary hearing [*Docs. 2* and *7*], motions for discovery [*Docs. 8, 9, 26* and *30*], motion to supplement authority [*Doc. 36*], and motion for release to a halfway house [*Doc. 37*].

---

    [1] **Within fourteen (14) days after a party is served with a copy of these proposed findings and recommended disposition, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommended disposition.  A party must file any objections with the clerk of the United States District Court for the District of New Mexico within the fourteen (14) day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition.   If no objections are filed, no appellate review will be allowed.   Pursuant to Fed. R. Civ. P. 72(b)(2), a party may respond to another party's objections within fourteen (14) days after being served with a copy of the objections.**

    [2] Unless otherwise noted, all referenced documents are from Case No. CIV-13-0738.

    [3] Even though Defendant titled his reply [*Doc. 35*] as a "Motion to Reply to Government's Answer Pursuant to Rule 5(d) of the Rules Governing Section 2255 Proceedings," the document appears, instead, to be a reply to the Government's response to Defendant's § 2255 motion, and the Court treats it as such.

United States District Judge William P. Johnson referred the claims raised in this case to the undersigned for proposed findings and a recommended disposition, and a hearing, if necessary. [*Doc. 4*].  Having considered the parties' submissions, relevant law, and the record in this case and in Defendant's underlying criminal case contained in Case No. CR-09-2626, the undersigned recommends, for the reasons set forth below, for the reasons stated above, that Defendant's motion to supplement authority [*Doc. 36*] be **GRANTED**, the claims raised in Defendant's § 2255 motion [*Doc. 1*] be **DENIED**, Defendant's motions for an evidentiary hearing, for discovery, and to be released to a halfway house [*Docs. 2, 7, 8, 9, 26, 30* and *37*] be **DENIED**, and that Case No. CIV-13-0738 be **DISMISSED with prejudice**.

In his § 2255 motion, Defendant raises eleven claims: Claim One: that both of his trial attorneys, Mr. Butcher and Mr. Baiamonte, were ineffective because they failed to give Defendant information about a plea offer from the Government (*Doc. 1-1* at 5-22), Mr. Butcher persuaded Defendant that he should go to trial instead of taking the plea offer (*id.* at 12-13), and Mr. Butcher failed to notice that the plea offer was flawed with regard to the statutory requirements for the length of sentence (*id.* at 22-23); Claim Two: that both of his trial counsel were ineffective for failing to consult a medical expert regarding a contributing cause of the victim's death (*id.* at 23-34); Claim Three: that Mr. Baiamonte was ineffective for failing to introduce evidence to support a theory that Defendant committed voluntary manslaughter instead of second degree murder (*id.* at 34 and *Doc. 1-2* at 1-8); Claim Four: that the Court and Mr. Baiamonte violated Defendant's due process rights by failing to present to the jury the question of whether Defendant or the victim were "Indians" under 18 U.S.C. § 1153 (*Doc. 1-2* at 9-12); Claim Five: that Mr. Baiamonte was ineffective for failing to request a lesser included offense of involuntary

manslaughter as a jury instruction (*id.* at 12-14); Claim Six: that Mr. Baiamonte was ineffective for failing to investigate the defense of involuntary manslaughter (*id.* at 14-16); Claims Seven and Nine: that Mr. Baiamonte was ineffective as Defendant's appellate counsel (*id.* at 16-17 and 18-20); Claim Eight: that the Court violated Defendant's Fifth and Sixth Amendment rights to be tried by an impartial jury with regard to any sentence enhancement authorized under 18 U.S.C. § 3147(1) (*id.* at 17-18); Claim Ten: that Mr. Baiamonte was ineffective for failing to object to the application of 18 U.S.C. § 3147 at sentencing and on appeal (*id.* at 20-23); and Claim Eleven: that the cumulative errors regarding Mr. Baiamonte's failure to object to the Court's instructions to the jury, failure to communicate with Defendant, and failure to request an extension of time when he became Defendant's counsel, resulted in ineffective assistance of counsel (*id.* at 24-28 and *Doc. 1-3* at 1-2).   Defendant asks the Court to vacate, set aside, or correct his sentence.   [*Doc. 1* at 12].

## Factual and Procedural Background

The facts that were testified to at Defendant's criminal trial are as follows: On the night of August 8, 2009, Defendant, his mother, his stepfather, and Jessica Shorty went fishing.   [*Doc. 97*, filed in Case No. CR-09-2626, at 129-30].   They were drinking and fished until midnight.   *Id.* at 132.   They returned to a small house where Defendant began arguing with Ms. Shorty and accusing her of cheating on him.   *Id.* at 133-34.   Ms. Shorty retreated into the house with her baby, Defendant's mother, Rachel Mutte, Daysha Jack, and Danika Jack.   *Id.* at 136. [4] Defendant's stepfather remained outside with Defendant, talked to him for about 30 minutes, and said that Defendant "finally calmed down."   *Id.* at 138-39.   Defendant's stepfather and mother left to go to their house, and Ms. Shorty, the baby, Rachel, Daysha and Danika went to sleep.   *Id.*

---

[4] Rachel Mutte is Defendant's stepsister and Ms. Shorty's cousin (*id.* at 140-41); Daysha Jack is Defendant's niece (*id.* at 171-72); and Danika Jack is Defendant's cousin (*id.* at 190-91).

at 149-50.   Later that night, Defendant started banging on the doors and windows of the house, and Rachel opened the door.  *Id.* at 150-52.   Defendant dragged Ms. Shorty out of the house by her feet.  *Id.* at 153-55.   The girls heard Defendant and Ms. Shorty arguing outside and heard Ms. Shorty screaming.   *Id.* at 155.   One of the girls in the house turned up the radio so they could not hear the screaming.   *Id.*   The screaming stopped and Defendant knocked on the door to the house and told Rachel that he and Ms. Shorty were going to walk to get the car.   *Id.* at 156. Rachel could see Ms. Shorty sitting on a chair with her head down.   *Id.* at 156-57.   After falling asleep again, Rachel was awakened by Defendant screaming her name.   *Id.* at 157-58.   Rachel went outside and saw that Ms. Shorty was not breathing and Defendant was breathing into her mouth.   *Id.* at 159.   Defendant told Rachel to get water from the house and when she did, he poured it into Ms. Shorty's mouth.   *Id.* at 160-61.   Rachel wanted to take Ms. Shorty to the hospital, but Defendant refused at first.   *Id.* at 163.   Eventually, Defendant and Rachel drove Ms. Shorty to the hospital where she was pronounced dead.   *Id.* at 163-67 and 44.   The emergency room doctor observed that Ms. Shorty had a significant amount of impacted, wet dirt in her mouth and throat, and significant trauma on her body, including multiple abrasions and bruising.   *Id.* at 45.

On September 9, 2009, Defendant was charged by indictment with Second Degree Murder committed while on release in another case and committed in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1153, and 3147(1).   [*Doc. 12*, filed in Case No. CR-09-2626].   On June 9, 2010, Defendant's appointed counsel, John V. Butcher, filed a motion for the Court to hold a hearing to determine if the Office of the Federal Public Defender should be removed from the case and new counsel appointed, stating that there were conflicts between Defendant and the

current defense team and that Defendant "has requested that a new attorney be appointed and will not cooperate with the current defense team." [*Doc. 29*, filed in Case No. CR-09-2626]. After holding a hearing on the motion, the Court granted the motion and appointed James Baiamonte as new counsel in the case. *See* [*Docs. 31, 32* and *33*, filed in Case No. CR-09-2626].

On September 15, 2010, a jury convicted Defendant of Second Degree Murder as charged in the indictment. [*Doc. 71*, filed in Case No. CR-09-2626]. On January 11, 2011, the Court sentenced Defendant to life in prison, and, upon release, a term of five years of supervised release, with the term of imprisonment to "run consecutive to [the] term imposed in related District of New Mexico Case 1:08CR0035-001WJ." [*Doc. 83*, filed in Case No. CR-09-2626 at 2-3]. On February 17, 2011, Defendant appealed his conviction to the Tenth Circuit Court of Appeals (*Doc. 85*, filed in Case No. CR-09-2626), and the Tenth Circuit affirmed his conviction on May 21, 2012 (*Doc. 108*, filed in Case No. CR-09-2626), reported at *United States v. Jack*, No. 11-2040, 483 Fed. Appx. 427, 2012 WL 1823933 (10th Cir. May 21, 2012) (unpublished)). On July 30, 2012, the Tenth Circuit entered an order allowing Mr. Baiamonte to withdraw as counsel for Defendant. [*Doc. 109*, filed in Case No. CR-09-2626]. Defendant timely filed his § 2255 motion on August 8, 2013. [*Doc. 1*].[5]

---

[5] A motion under 28 U.S.C. § 2255 is timely if it is filed within one year from the date the conviction becomes final. *See* 28 U.S.C. § 2255(f)(1). The United States Supreme Court has held that, "[f]or the purpose of starting the clock on § 2255's one-year limitation period . . . a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." *Clay v. United States*, 537 U.S. 522, 525 (2003). The Tenth Circuit dismissed Defendant's appeal on May 21, 2012, and he had 90 days from that date, or until August 20, 2012, in which to file a petition for writ of certiorari with the United States Supreme Court. *See* U.S. Sup. Ct. R. 13(1). Since Defendant filed his motion within one year of that time, on August 8, 2013, his motion is timely.

## Discussion

### A.   Ineffective Assistance of Counsel Claims

In evaluating an ineffective assistance of counsel claim, an attorney's performance is measured by the two-prong standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).   To prevail on an ineffective assistance claim under the *Strickland* standard, Defendant must show that (a) his attorney's performance was deficient because it fell below an objective standard of reasonableness, and (b) he was prejudiced by the attorney's deficient performance.   *Id.* at 687.   Both showings must be made to satisfy the *Strickland* standard.   *Id*.   To demonstrate unreasonable performance, Defendant must show that his attorney made errors so serious that his performance could not be considered "reasonable[] under prevailing professional norms."   *Id.* at 688.   To demonstrate prejudice, Defendant must show a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different but for his attorney's alleged unprofessional errors.   *Id.* at 694.   The Court does not have to address both prongs of the *Strickland* standard if Defendant makes an insufficient showing on one of the prongs.   *Id.* at 697.

### *1.   Claim Regarding a Plea Offer*

Defendant makes three claims that his counsel was ineffective with regard to an alleged offer of a plea agreement by the Government.   Defendant alleges that his first trial counsel, Mr. Butcher, told him that the Government had offered him a plea agreement which would reduce his charge from second degree murder to involuntary manslaughter with a sentence of eighteen years (8 years for involuntary manslaughter and 10 years for committing the crime while on conditions of release while awaiting self-surrender to prison for committing another violent

crime).   [*Doc. 1-1* at 5].   Defendant claims that Mr. Butcher persuaded him that he was not going to be convicted of second degree murder and would receive the same amount of prison time as the eighteen-year plea offer if he went to trial.   *Id.* at 12-13.   Defendant also claims that neither Mr. Butcher nor Mr. Baiamonte gave Defendant sufficient details regarding the terms of the plea offer, including the expiration date of the offer, so that Defendant could make an informed decision.   *Id.* at 14 and 17.   Defendant further claims that Mr. Butcher was ineffective for failing to notice that the plea agreement was flawed with regard to the statutory requirements for the length of sentence, arguing that the 8 year maximum sentence for involuntary manslaughter could never be enhanced by 10 years under 18 U.S.C. § 3147.   *Id.* at 22-23.[6]   In response, the Government states that no plea offer was ever made to Defendant, so there could not be ineffective assistance of counsel with regard to a plea offer.   [*Doc. 32* at 5-9].

A defendant has no right to be offered a plea bargain and, while a defendant has a right to effective assistance of counsel in considering whether to accept a plea offer, this is only the case when a plea bargain has actually been offered.   *See Lafler v. Cooper*, 132 S.Ct. 1376, 1387 (2012) ("If no plea offer is made, the issue [of ineffective assistance of counsel] simply does not arise."). In *Lafler*, a plea offer was presented to the defendant, but was rejected on advice of counsel. 132 S. Ct. at 1383.   The defendant proceeded to trial, which resulted in a guilty verdict and a sentence that was harsher than what was offered in the rejected plea bargain.   *Id.*   The Supreme Court held that the defendant was prejudiced by his counsel's deficient performance in advising him to reject the plea offer and go to trial.   *Id.* at 1391.   In *Missouri v. Frye*, 132 S.Ct. 1399, 1404 (2012), the prosecutor sent the defendant's counsel a letter offering a choice of two possible plea bargains, stating that both offers would expire on a date certain.   The defendant's counsel did not

---

[6] On March 21, 2014, Defendant filed a motion to supplement authority [*Doc. 36*] regarding this claim, which, because the Court considers the supplemental authority below, the Court recommends be granted.

advise the defendant that the offers had been made, and the defendant later pleaded guilty absent a plea agreement and to harsher terms than what was originally offered.  *Id.* In *Frye*, the United States Supreme Court explained that only a *formal* offer to accept a plea must be communicated by counsel, and the failure to do so renders counsel's performance constitutionally deficient.   The Supreme Court stated that "[a]ny exceptions to that rule need not be explored here, for the offer [in *Frye*] was a formal one with a fixed expiration date." *Id.*   The Supreme Court further explained that, "the fact of a formal offer means that its terms and its processing can be *documented* so that what took place in the negotiation process becomes more clear if some later inquiry turns on the conduct of earlier pretrial negotiations." *Id.* at 1409 (emphasis added).   The Supreme Court explained that some states may have rules requiring all offers to be in writing "to ensure against later misunderstandings or fabricated charges," or that "formal offers can be made part of the record at any subsequent plea proceeding or before a trial on the merits, all to ensure that a defendant has been fully advised before those further proceedings commence." *Id.*   To show prejudice from any deficient performance under these cases, the defendant "must demonstrate a reasonable probability [that he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel," and must further "demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it." *Id.*

Here, the Assistant United States Attorney and both of Defendant's trial counsel swear in affidavits that no plea offer was ever made by the Government in Defendant's underlying criminal case.  *See Doc. 32-1* at 2-3 (Affidavit of Assistant United States Attorney Rumaldo R. Armijo) ("The government made an early decision not to extend a plea offer to [Defendant] to a lesser

included offense of Second Degree Murder because he had killed [Ms.] Shorty while he was on conditions of release after previously committing a violent crime and because of the brutality of the murder of [Ms.] Shorty. . . . The United States never extended a plea offer to [Defendant] in [this case]."); *Doc. 32-2* at 2 (Affidavit of Mr. Baiamonte) ("No plea offers were made by the United States."); and *Doc. 32-3* at 5 (Affidavit of Mr. Butcher) ("The government never made a formal plea offer to [Defendant]. . . . Since there was no plea offer, there was no offer in writing and [Mr. Butcher] does not have a copy of the plea offer.   There was no oral plea offer.   Thus, no oral offer was told to [Defendant].").   Significantly, Defendant admits that a formal plea offer was never made and, instead, states that "[Mr.] Butcher and the government conducted an informal plea 'Verbal plea.'"   [*Doc. 35* at 2].   Defendant further concedes that "[t]he government and defense counsel didn't follow procedures of a <u>formal</u> plea back in 2009-2010," and that they "failed to <u>document</u> the plea."   *Id.* at 3 (emphasis added).

While Defendant submits an affidavit from his mother stating that Mr. Butcher "told [her] the the [sic] United States District [sic] Attorney suggested a [sic] 18 year plea bargain for [Defendant]" (*Doc. 1-3* at 6), and an affidavit from his uncle stating that he spoke to Mr. Butcher "once about [Defendant's] situation" and Mr. Butcher "stated that there was a [sic] 18 year plea that the goverment [sic] was offering" (*id.* at 8), neither of these affidavits support a finding that there was a formal, documented plea offer from the Government.   Instead, in his sworn affidavit, Mr. Butcher explains that he was the one who told Defendant that an involuntary manslaughter verdict would likely result in a sentence of eighteen years, and that Mr. Butcher suggested eighteen years to Defendant as a starting point for plea negotiations with the Government, but that no offers were ever made either by Defendant or by the Government.   *See* [*Doc. 32-3* at 4-10].

Mr. Butcher also explained that a second degree murder verdict would likely result in a life sentence.   *Id.* at 4.   However, Mr. Butcher states that "[Defendant], for the most part, refused to enter any plea negotiations at all.   In fact, it was the discussions of plea negotiations and possible manslaughter strategies that was the impetus for [Defendant] to remove [Mr. Butcher] and his office from further representation."   *Id.* at 6.   Furthermore, Mr. Butcher states that he has no specific recollection of talking to Defendant's mother but he "did talk to supporters of Defendant . . . in an attempt to get their support to encourage [Defendant] to enter into plea negotiations."   *Id.* at 7.   He also has no recollection of talking to Defendant's uncle but "it would be consistent with [his] strategy in encouraging family members to support a resolution by plea of the case."   *Id.* at 8. Mr. Butcher states in his affidavit that he "never told anyone that the United States Attorney's Office had offered or suggested a plea bargain of 18 years.   The 18 years number came from [Mr. Butcher]."   *Id.* at 8.   Importantly, Defendant does not dispute any of these sworn statements by Mr. Butcher in his reply brief, other than stating that it was Mr. Butcher's advice that led him to reject the alleged verbal plea offer.   [*Doc. 35*].

Again, as the Supreme Court explained in *Frye*, a formal plea offer must have a fixed expiration date, with "terms and [] processing that can be documented so that what took place in the negotiation process becomes more clear if some later inquiry turns on the conduct of earlier pretrial negotiations."   132 S.Ct. at 1409.   A verbal plea offer that was never set forth in writing or otherwise documented does not appear to constitute a formal plea offer under the holding of *Frye*.   *See United States v. Rendon-Martinez*, No. 12-6175,  497  Fed.  Appx. 848, 849, 2012 WL 4458385 (10th Cir. Sept. 27, 2012) (unpublished) (explaining that, when there is no formal plea offer, "mere speculation" regarding a favorable plea that might have been forthcoming

is insufficient to show ineffective assistance of counsel under *Strickland*, and rejecting an ineffective assistance of counsel claim that the claimant's counsel should have sought out a favorable plea).    In *United States v. Merlino*, Criminal Action No. 99-10098-RGS, 2014 WL 793987 at *4 (D.Mass. Feb. 28, 2014) (unpublished), the court stated: "A majority of courts . . . have held that a formal plea offer must consist of something more than preliminary oral communications." (citations omitted).    Similarly, the court in *Greenspan v. Cate*, No. 12-CV-2402-AJB(BGS), 2014 WL 197749, at *36 (S.D.Cal. Jan. 16, 2014) (unpublished), explained that "[i]n contrast to *Frye*, . . . [the] prosecutor extended no formal plea offer, written or even verbal, containing the no sex offender registration term [and] [a]lthough [the defendant] may well have accepted a plea offer that provided for avoidance of the sex offender registration consequence, as he now represents, the record reflects his attorney's attempt to secure such an offer never came to fruition."    That court further stated that "[the defendant] identifies no controlling United States Supreme Court authority for the proposition that an inchoate bargain proposed by defense counsel during plea negotiations, even one a prosecutor may have agreed to propose to his or her supervisor, can support an [ineffective assistance of counsel] claim [under the holding of *Frye*] when there was no resulting offer that defense counsel could have communicated to the defendant."  *Id.*  The court in *United States v. Petters*, Crim. No. 08-364 (RHK), Civ. No. 13-1110 (RHK), 2013 WL 6328544, at *3 (D.Minn. Dec. 5, 2013) (unpublished) found that there was no formal plea offer where "there was no written offer from the Government, but rather only oral communications between counsel."    The court in *Montgomery v. United States*, Criminal Action No. 3:07-CR-00036-CRS, 2013 WL 6196554, at *4 (W.D.Ky. Nov. 26, 2013) (unpublished), stated that the Supreme Court "clearly intended to distinguish 'offers made during

the course of preliminary negotiations from those made once negotiations have concluded," and that "there must at the very least be some basis for concluding that the alleged offer could have been accepted or rejected without further discussion or negotiation."

The Court further finds that *McIntosh v. United States*, No. 13 C 4192, 2013 WL 5567578, at *4 (N.D.Ill. Oct. 9, 2013) (unpublished) is similar to this case because, in that case, defense counsel swore under oath and the prosecutor declared that the government never made a formal plea offer, and the defendant did not contradict the assertion of the government that it never offered a formal plea. The court there found that the defendant's mere allegation that an assistant prosecutor proposed a plea was insufficient to constitute proof of a formal plea because "formal plea offers cannot be made without supervision by the leadership of the [District Attorney's] office," "[t]here is no evidence that a formal plea offer was made," and "[t]here is no claim that [the defendant] has ever received a draft of a written plea agreement." *Id.* at *4, n.4. With regard to the defendant's requests for recorded phone conversations from the Bureau of Prisons between the defendant and his attorney, the court stated that "[a]ssuming the tapes are available and assuming that defense counsel did, in fact, talk about plea deals with the government, there remains no proof of the existence of a formal plea agreement." *Id.* In addition, in *Elem v. Ryan*, No. CV-09-00664-TUC-FRZ, 2013 WL 5434579, at *20 (D.Ariz. Sept. 27, 2013) (unpublished), the court found that, "although counsel may have engaged in plea discussions, Petitioner failed to show that the state ever extended a plea offer," where the government stated that no formal plea offer was ever extended and where there was no evidence of "an actual, concrete plea offer" in the record; thus, "Petitioner's claim that counsel failed to inform her of the plea offer is merely conclusory." Finally, in *United States v. Waters*, Civil Action No. 13-115, Criminal Action

No. 11-100, 2013 WL 3949092, at *10 and n. 3 (E.D.Pa. July 31, 2013) (unpublished), the court found that there was no formal plea offer where the proposal was alleged to come from a prosecutor without the authority to enter into a binding agreement and where there was no evidence of a written agreement, contrary to an office policy requiring that offers be in writing.

While one district court has stated that the holding in *Frye* may provide that "even if a firm offer is not conveyed to defense counsel, when the government indicates it is willing to negotiate a resolution in a case, defense counsel has a duty to engage in the negotiation process," and that "[c]ounsel can be constitutionally ineffective in the plea negotiation process if they fail to convey to the defendant the government's articulated willingness to resolve a case by negotiation of [the government's] proposed [] resolution to the case," that case involved a plea offer that was contingent upon approval by a "Screening Committee," but was still communicated in <u>writing</u> by the Government to the defendant, and was, therefore, clearly more formal than the alleged verbal offer here.   *United States v. Polatis*, No. 2:10-CR-0364, 2013 WL 1149842, at *10 n.16 (D.Utah March 19, 2013) (unpublished) (citation and internal quotation marks omitted).   In any event, Defendant does not dispute that the alleged verbal plea offer was communicated to him by his counsel.   Thus, Defendant's position is the same as the defendant's position in *Greenspan*: "Although [Defendant] may well have accepted a plea offer that provided [a more favorable charge or sentence], as he now represents, the record reflects his attorney's attempt to secure such an offer never came to fruition."   2014 WL 197749 at *36

Finally the Court considers the supplemental authority submitted by Defendant on March 21, 2014.   [*Doc. 36*].   Defendant contends that the holding in *Milton v. Miller*, No. 12-6187, 2014 WL 892890, at *1 (10th Cir. March 7, 2014) is applicable to his case.   In

*Milton*, the Tenth Circuit considered the district court's ruling on a claim of ineffective assistance of appellate counsel in a § 2254 habeas petition.  In that case, the defendant was charged with seven criminal counts and, at a pretrial hearing, the trial judge discussed a possible plea bargain noting that, prior to the preliminary hearing, the defendant had the opportunity to plead guilty and receive 23 years, but he turned that offer down.  *Id.*  The defendant stated that he had not heard about that prior offer, and the prosecutor read the notes from the former prosecutor which stated that the former prosecutor had presented a plea offer to the defendant with regard to the charges in the case before the court at the time as well as a previous criminal case that was pending at the time the plea offer was made.  *Id.*  The trial judge stated that the State was no longer making that offer, and then discussed the existing plea offer from the State, which was for 40 years.  *Id.* at *2.  In the district court's ruling on the defendant's § 2254 petition, the district court considered an affidavit from the defendant's prior counsel, who stated that the State initially offered the defendant a 20-year plea bargain with regard to both cases that were pending at the time, and that the attorney communicated this offer to the defendant and the defendant rejected it.  *Id.* at *4.  The district court rejected the defendant's claim for ineffective assistance of appellate counsel for failure to raise this issue on appeal, and the Tenth Circuit found that this holding was in error because "[a] review of [the defendant's] trial transcripts should have alerted [the defendant's] appellate counsel to the possibility that [the defendant's] trial attorney failed to promptly and meaningfully convey to [the defendant] the existence of a plea offer made by the prosecution at some point prior to the . . . preliminary hearing in [the defendant's criminal case]."  *Id.* at *9   The Tenth Circuit remanded the case for an evidentiary hearing to resolve the factual issues relating to the ineffective assistance of appellate counsel claim.  *Id.* at *10.

The Court finds that this case is distinguishable from Defendant's claim because in *Milton* there was documentation of a plea offer that was made by the government to the defendant, and all parties agreed as to the existence of the plea offer, but there was a dispute regarding whether the plea offer was communicated to the defendant by his counsel.   Here, as discussed above, the parties all agree that there was no formal plea offer from the government in this case.   Therefore, the question of whether Mr. Butcher discussed an inchoate plea offer with either the government, Defendant, or even Defendant's family, is immaterial absent a formal plea offer by the government.   *See Lafler*, 132 S.Ct. at 1387 ("If no plea offer is made, the issue [of ineffective assistance of counsel] simply does not arise.").   Unlike the district court in *Milton*, the Court here is not assuming the credibility of Mr. Butcher's affidavit over the assertions made by Defendant because there is no dispute regarding the lack of a formal plea offer which could have been accepted or rejected by Defendant.   Therefore, the Court finds that the holding in *Milton* does not require that the Court conduct an evidentiary hearing.

For the reasons stated above, the Court finds that, absent any evidence of a formal plea offer in this case that Defendant could have either accepted or rejected, Defendant has failed to show any breach of duty by his trial counsel under the holdings of *Frye* and *Lafler*.   The Court need not determine credibility with regard to this issue because all parties agree that there was never a formal plea offer from the Government for Defendant to consider.   For these reasons, the Court recommends that Defendant's ineffective assistance of counsel claims regarding both his counsels' treatment of a plea offer be denied.

### 2.   Counsel's Alleged Failure to Consult a Medical Expert

Defendant next contends that both of his trial counsel were ineffective for failing to consult a medical expert with regard to an alleged head injury that Ms. Shorty sustained about a month before she died.   [*Doc. 1-1* at 23-34].   Defendant contends that, if this injury had been investigated, a medical expert could have opined that the previous head injury played a significant role in the cause of her death, and the outcome of Defendant's trial would have been different.   *Id.* at 29-30 and 34.   In response, the Government states that there is no evidence in the record linking the blunt force injuries sustained by Ms. Shorty the night she died to an injury Ms. Shorty may have suffered a month before she died.   [*Doc. 32* at 10].   Moreover, the Government states that, even if the previous injury could be linked to any of the blunt force injuries Ms. Shorty sustained the night she died, it would not matter because the state's medical examiner, Dr. Mock, found that, although <u>multiple</u> blunt force injuries contributed to her death, Ms. Shorty died of asphyxiation and the manner of death was homicide.   *Id.* at 10-11. The Government further states that "there are no medical reports to show that the alleged injury she received on July 4, 2009 was the severe head injury identified by Dr. Mock [in his pathology report]."   *Id.* at 10 and [*Doc. 32-5*].

The Court finds that Defendant fails to show a reasonable probability that the outcome of his case would have been different had his counsel consulted with a medical expert regarding Ms. Shorty's prior head injury.   Defendant fails to provide any evidence that the prior injury was significant or had any continuing effect on Ms. Shorty.   Defendant's grandmother stated in an affidavit that Ms. Shorty had a big bump on the side of her head about a month prior to the date Ms. Shorty died, but she also stated that Ms. Shorty said she was all right after Defendant's grandmother suggested she go to the hospital.   [*Doc. 1-3* at 18].   Without any evidence to show

that an expert would have testified any differently than Dr. Mock did regarding Ms. Shorty's cause of death, Defendant cannot show that he was prejudiced by his counsel's failure to consult with a medical expert.   *See Boyle v. McKune*, 544 F.3d 1132, 1138 (10th Cir. 2008) (finding no prejudice for counsel's allegedly unprofessional errors when no evidence was supplied to show that medical evidence to support the claimant's version of events could be secured, stating that "as easily as one can speculate about favorable testimony, one can also speculate about unfavorable testimony") (citation omitted).   Therefore, the Court recommends that this claim be denied.

### *3.   Alleged Failure to Introduce Evidence Regarding Voluntary Manslaughter*

Defendant's third claim is that Mr. Baiamonte was ineffective for failing to introduce evidence that Defendant killed Ms. Shorty as a "crime of passion" and should have been convicted of voluntary manslaughter, not second degree murder.   [*Doc. 1-1* at 34 and *Doc. 1-2* at 1-9].   Defendant contends that he was angry because Ms. Shorty was possibly having an affair, and Defendant provides a list of evidence that he contends should have been introduced by Mr. Baiamonte to support a finding that Defendant thought Ms. Shorty was cheating on him thereby committing voluntary manslaughter, not second degree murder.   [*Doc. 1-2* at 1-7].   The list of evidence Defendant contends should have been introduced is: (1) a vehicle accident report from August 7, 2009 showing that Defendant's vehicle had been in an accident when Ms. Shorty drove it to a motel to be with her paramour; (2) a hotel receipt from August 7, 2009 ostensibly to show where Ms. Shorty had been with her alleged paramour; (3) a receipt from an impound lot; (4) Ms. Shorty's arrest report for aggravated DUI on August 7, 2009; (5) Defendant's stepfather's statement regarding assisting Defendant in bonding Ms. Shorty out of the San Juan Detention Center and traveling to the hotel and retrieving the car from the impound lot; (6) Defendant's

mother's statement regarding traveling to the hotel, retrieving the car, and Ms. Shorty's statement that she wanted to commit suicide; (7) Rachel's Mutte's statement that she heard Defendant accuse Ms. Shorty of cheating on him and witnessed Ms. Shorty sitting in a chair fully clothed; and (8) Daysha Jack's statement that Defendant banged on the door five minutes after his parents left and that Daysha overheard the argument about what transpired at the hotel the previous day. [*Doc. 1-2* at 1, 6-7].   In response, the Government states that the evidence that Defendant contends should have been introduced by his attorney would have been cumulative because his counsel did present evidence showing that Defendant thought Ms. Shorty was cheating on him at trial.   [*Doc. 32* at 17].   Four of Defendant's witnesses testified that they heard Defendant accuse Ms. Shorty of cheating on him.   *Id.*   In addition, the Government contends that the evidence would not be sufficient to raise a "heat of passion defense" because it would not establish that there was a sudden and reasonable provocation, and because the evidence showed that Defendant was intoxicated when he killed Ms. Shorty, which would disqualify him from voluntary manslaughter. *Id.* at 17-18.

The Court finds that Defendant has failed to show that his counsel was ineffective for failing to introduce evidence that Defendant contends would have shown that Defendant committed voluntary manslaughter because he killed Ms. Shorty in a "heat of passion."   First, as the Government points out, Defendant's counsel did introduce evidence regarding Defendant's belief that Ms. Shorty was cheating on him.   *See* [*Doc. 97*, filed in Case No. CR-09-2626, at 133, 144, 153, 155, 179, 182, and 194] (trial testimony from various witnesses regarding Defendant accusing Ms. Shorty of cheating on him).   In addition, the evidence Defendant contends his counsel should have introduced would not have led to a voluntary manslaughter conviction

because, in order for a defendant to have his intentional killing reduced from murder to voluntary manslaughter, there must be evidence showing: (1) reasonable provocation; (2) that the defendant was in fact provoked; (3) that a reasonable man so provoked would not have cooled off in the interval of time between the provocation and the fatal blow; and (4) the defendant must not have in fact cooled off during that interval.   *See Jack*, 483 Fed. Appx. at 428 (citing 2 Wayne R. LaFave, *Substantive Criminal Law* § 15.2(a), at 494 (2d ed. 2003)).   Here, much of the evidence Defendant asks to have admitted pertains to events that happened the day before Ms. Shorty's death.   Moreover, evidence introduced at trial shows that Defendant actually cooled off by the time of Ms. Shorty's death.   *Id.* at 429, citing [*Doc. 97* at 139] (testimony of Defendant's stepfather stating that, after they talked for about 30 minutes, Defendant "calmed down").   Finally, as the Tenth Circuit noted in Defendant's direct appeal of whether the jury should have been instructed on a "heat of passion" defense, the evidence in the record established that Defendant was drunk when he became enraged and killed Ms. Shorty, so he does not qualify for voluntary manslaughter treatment "where, because of intoxication, he easily loses his self-control; that is to say, he is to be judged by the standard of the reasonable sober man."   *See Jack*, 483 Fed. Appx. at 428, n.1 (citing LaFave, *Substantive Criminal Law* § 15.2(b)(10), at 504).   The Court, therefore, finds that Defendant has failed to show that his counsel's performance fell below an objectively reasonable standard or, even if it did, that the outcome of his case would have been different but for his counsel's allegedly unprofessional errors.   The Court recommends that this claim be denied.

#### *4.   Claim Regarding 18 U.S.C. § 1153*

Next, Defendant contends that the Court and Defendant's counsel violated Defendant's constitutional rights because the Government failed to present to the grand jury and in the jury instructions information regarding whether Defendant and/or Ms. Shorty were "Indians" under 18 U.S.C. § 1153.   [*Doc. 1-2* at 9].   While he concedes that "the government presented to the jury the 'Indian Status' of [Defendant] and [Ms.] Shorty," he alleges that "[t]he Government failed to present 'Indian Status' . . . in the Jury Instructions and to the Grand Jury," which "is crucial to [] establish jurisdiction over [Defendant]."   *Id.*   Defendant also contends that the jury was not presented with information regarding Ms. Shorty's status as an "Indian."   *Id.* at 10.   The Government states …

Section 1153(a) states: "Any Indian who commits against the person . . . of another Indian or other person any of the following offenses, namely, murder [or] manslaughter . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."   18 U.S.C. § 1153(a).   The parties stipulated that both Defendant and Ms. Shorty were enrolled members of the Navajo Nation and were "Indians" as defined by federal law, and this stipulation was signed by Defendant.   [*Doc. 32-9*]   This stipulation was read at trial to the jury and admitted into evidence as Government's Exhibit 7.   *See* [*Doc. 98*, filed in Case No. CR-09-2626, at 15-17].   In the jury instructions, the jury was told that Defendant was an Indian and was charged with killing Ms. Shorty, also an Indian, in violation of 18 U.S.C. §§ 1153 and 1111(a).   *See* [*Doc. 66*, filed in Case No. CR-09-2626, at 3 and 5].   The jury, therefore, was presented with information regarding both Defendant's and Ms. Shorty's status as "Indians."

Regarding Defendant's concern that the indictment (*see Doc. 12*, filed in Case No. CR-09-2626) makes no mention of Ms. Shorty's status as an "Indian" (*see Doc. 1-2* at 10), the statute only requires that an Indian be accused of committing the enumerated crime, not that the victim must also be an Indian.  *See* 18 U.S.C. § 1153 ("Any Indian who commits against the person . . . of another Indian *or other person*") (emphasis added).  Furthermore, the indictment states that Defendant is an Indian which satisfies the jurisdictional requirements of § 1153(a). The cases upon which Defendant relies do not support his claim because one of them involves a situation where the issue was whether the involved party or parties were "Indians" under federal law, not whether evidence pertaining to the statute was presented to the grand jury or in jury instructions (*see United States v. Zepeda*, 705 F.3d 1052, 1054 (9th Cir. 2013)), and the other involves a situation where the indictment did not allege either the defendant's or victim's Indian or non-Indian status as required by 18 U.S.C. § 1152, which pertains to crimes occurring in Indian country between an Indian and a non-Indian (*see United States v. Prentiss*, 206 F.3d 906, 966 and 974-75 (10th Cir. 2000)).  Again, Defendant's status as an Indian was alleged in the indictment, thus satisfying § 1153.  Defendant does not claim that he is not an Indian as defined by federal law and, in fact, stipulated to this fact at trial by signing the stipulation.  Additionally, he provides no support for his contention that his constitutional rights were violated because information regarding his status as an Indian was not presented to the grand jury or in the jury instructions.  These contentions are not borne out by the evidence before the Court.  Therefore, the Court finds that this claim is without merit and recommends that it be denied.

### *5.   Failure to Request Lesser Included Offense of Involuntary Manslaughter*

Defendant next claims that Mr. Baiamonte was ineffective for failing to request a jury instruction of involuntary manslaughter as a lesser included offense of the second degree murder charge.  [*Doc. 1-2* at 12].  Defendant states that, because he had no intent to kill, his counsel should have requested a jury instruction regarding involuntary manslaughter.  *Id.* at 12-14.  The Government points out that the jury in Defendant's underlying criminal case was instructed as to second degree murder and the lesser included offense of voluntary manslaughter.  [*Doc. 32* at 25] (citing *Doc. 66*, filed in Case No. CR-09-2626, at 5-7).  Second degree murder requires a finding that the killing took place with "malice aforethought," which was defined for the jury as either killing another "deliberately and intentionally, or . . . with callous and wanton disregard for human life."  [*Doc. 66*, filed in Case No. CR-09-2626, at 5].  The jury instructions explained that the difference between voluntary manslaughter and second degree murder is that voluntary manslaughter does not require the government to prove that the defendant acted with callous and wanton disregard for human life.  *Id.* at 6.  The jury unanimously found Defendant guilty of second degree murder and, therefore, it did not reach the lesser offense of voluntary manslaughter, although it had the option to do so.  Defendant fails to explain how it would have made a difference in his case if the jury had been presented with a jury instruction for involuntary manslaughter, when the jury found him guilty of second degree murder and did not even reach the instruction regarding voluntary manslaughter.  There is not a reasonable probability that adding an instruction for the further lesser included offense of involuntary manslaughter would have altered the verdict of second degree murder.  The Court, therefore, finds that Defendant fails to

show prejudice by his counsel's allegedly unprofessional error regarding an involuntary manslaughter instruction, and recommends that this claim be denied.

### 6.   *Failure to Investigate Defense that Ms. Shorty Committed Suicide*

Next, Defendant contends that Mr. Baiamonte was ineffective because he failed to investigate whether Ms. Shorty "might have" committed suicide by putting sand in her own mouth.   [*Doc. 1-2* at 14-15].   Defendant states that witnesses would have testified that Ms. Shorty was suicidal and had tried to commit suicide before.   *Id.* at 15.   Defendant presents no evidence showing that Ms. Shorty may have caused her own death by putting sand in her mouth.   In contrast, the evidence in the record shows that Defendant dragged Ms. Shorty out of the house by her feet while she was nursing her baby, and that the emergency medicine doctor found that Ms. Shorty had "a significant amount of impacted, wet dirt that filled her mouth and throat" and "had significant trauma on her body which included multiple abrasions and bruising." *See* [*Doc. 97*, filed in Case No. CR-09-2626, at 153-55 and 45].   The Government also points out, persuasively, that Defendant's defense that Ms. Shorty "might have" put the dirt in her mouth in an attempt to kill herself, flies in the face of his earlier assertion that his attorneys should have pressed for a defense that Defendant involuntarily killed Ms. Shorty in the heat of passion.   [*Doc. 32* at 27-28].   Counsel's failure to assert such inconsistent defenses does not establish ineffective representation.   Defendant, therefore, fails to show that his counsel's actions were objectively unreasonable by failing to investigate whether Ms. Shorty committed suicide or that there is a reasonable probability that the outcome of his case would have been different but for his counsel's alleged error.   The Court recommends that this claim be denied.

### *7.   Alleged Ineffectiveness of Appellate Counsel*

Defendant next claims that his appellate counsel, who was also Mr. Baiamonte, was ineffective during the appellate stage of his case.   [*Doc. 1-2* at 16].   Defendant states that Mr. Baiamonte failed to consult with Defendant and failed to withdraw as counsel, and that he told Defendant that he hoped Defendant died in prison.   *Id.*[7]   Defendant states that, if Mr. Baiamonte had withdrawn, Defendant "would most likely had [sic] an attorney appointed that would have followed the ABA Standard for Criminal Justice" and "would have prevailed in the appellate stage."   *Id.*   In response, the Government states that Defendant has failed to state how the outcome of his case would have been any different had Mr. Baiamonte withdrawn as appellate counsel.   [*Doc. 32* at 29].   The Court finds that this claim is without merit because Defendant fails to state with any particularity what steps he thinks that his counsel should have taken and how that would have changed the outcome of Defendant's case.   The Court, therefore, finds that this claim is conclusory and speculative and should be denied.   *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (*pro se* litigant must allege "sufficient facts on which a recognized legal claim could be based," and "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based").

### *8.   Claim Regarding Sentencing*

Defendant was convicted of second degree murder committed while on supervised release in another case, in violation of 18 U.S.C. §§ 1111(a) and 3147(1).   *See Doc. 83*, filed in Case No. CR-09-2626.   Defendant claims that, because the issue of whether he was on release was never presented to the jury, his sentence was improperly enhanced with regard to § 3147(1).   [*Doc. 1-2* at 17-18].   In response, the Government states that § 3147 is a sentence enhancement and

---

[7] Mr. Baiamonte denies that he told Defendant that he hoped he died in prison.   [*Doc. 32-2* at 3].

self-executing provision that need not be presented to the jury, and that, nevertheless, Defendant is procedurally barred from raising this defense because it was not raised on his direct appeal. [*Doc. 32* at 30-31].   The Government further contends that the statutory minimum or maximum sentences were not affected by this alleged error.   *Id.* at 31-32.

Section 3147(1) states:

A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense to--

(1) a term of imprisonment of not more than ten years if the offense is a felony.

Section 3147(1), however, does not constitute a separate offense of conviction, but, instead, is a sentence enhancement provision, and is self-executing.   *See United States v. Browning*, 61 F.3d 752, 756-57 (10th Cir. 1995).   In addition, this claim should be denied because it could have been raised on appeal, but was not, so Defendant is procedurally barred from raising the claim now.   *See United States v. Bolden*, 472 F.3d 750, 752 (10th Cir. 2006) (explaining that a petitioner is barred from raising an issue in a § 2255 motion that he failed to raise on direct appeal "unless he can show cause excusing his procedural default and actual prejudice resulting from the errors of which he complains, or can show that a fundamental miscarriage of justice will occur if his claim is not addressed") (citation and internal quotation marks omitted).   The United States Supreme Court has explained that "the question of cause for a procedural default does not turn on whether counsel erred or on the kind of error counsel may have made," but instead the "cause" standard requires Defendant to "show that some objective factor external to the defense impeded counsel's" ability to raise an issue on direct appeal.   *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).   Examples of an "objective factor external to the defense" that would constitute cause for

-25-

failing to raise an issue on appeal include "a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or that some interference by officials made compliance impracticable." *Id.* (internal citations and quotation marks omitted).   Ineffective assistance of counsel is another external factor that may constitute "cause" excusing a procedural default.   *Id.* The "fundamental miscarriage of justice" exception applies only in a narrow class of cases involving "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Defendant filed a direct appeal of his conviction with the Tenth Circuit Court of Appeals, but he failed to raise in his direct appeal the claim that his sentence was improperly enhanced with regard to § 3147(1).   Defendant fails to make any showing of cause excusing him from failing to raise this claim on appeal, other than a "breakdown in communication" with his attorney.   [*Doc. 35* at 17].   This statement is too vague and insufficient to show the requisite cause, and, importantly, Defendant does not state that his counsel was ineffective for failing to raise this issue on appeal. Defendant also fails to show that a fundamental miscarriage of justice will occur if this claim is not addressed.   Therefore, the Court finds that the claim is procedurally barred and recommends that it be denied.

### *9.   Claim that Mr. Baiamonte was Ineffective for Failing to Petition for a Rehearing*

Defendant next claims that Mr. Baiamonte was ineffective because he did not petition for a rehearing on Defendant's direct appeal.   [*Doc. 1-2* at 18-20].   Defendant states that, if Mr. Baiamonte had filed a petition for a rehearing, Defendant could have shown that he was "provoked anew" by Ms. Shorty, and cites to the testimony of Rachel Mutte and Danika Jack regarding the yelling or screaming that they overheard between Defendant and Ms. Shorty.

[*Doc. 1-2* at 20] (citing *Doc. 97*, filed in Case No. 09-CR-2626 at 167-68 and 201-02).   In response, the Government states that Defendant does not have a constitutional right to counsel in pursuing a discretionary review of his appeal, and that his claim that the was "provoked anew" is without merit.   [*Doc. 32* at 33-36].

The Tenth Circuit has held that "a petition for rehearing will be granted only if the [appellate] court has overlooked or misconstrued a significant issue."   *See United States v. Rhodes*, No. 97-8097, 156 F.3d 1245, 1998 WL 480138, *2 (10th Cir. Aug. 7, 1998) (unpublished) (citing 10th Cir. R. 40.1).   None of the testimony to which Defendant cites shows that the Tenth Circuit overlooked or misconstrued any significant issue.   As the Tenth Circuit stated in Defendant's direct appeal, "[e]vidence of a string of prior arguments and a continuing dispute, without any indication of some sort of instant incitement, does not constitute sufficient evidence to show heat of passion."   *Jack*, 483 Fed. Appx. at 429 (citation and internal quotation marks omitted).   The Tenth Circuit further noted that Defendant was drunk when he became enraged and killed Ms. Shorty, so he would not qualify for the voluntary manslaughter defense.   *Id.* at 428 n.1. More significantly, the Tenth Circuit found that, "[a]lthough it is theoretically possible some new event rekindled [Defendant's] passion after he calmed down but before he killed Ms. Shorty such that he was reasonably provoked anew, . . . there is no evidence in the record about any such event."   *Id.* (citation omitted).   Given that the Tenth Circuit considered the entire record, including Defendant's citations listed above, it is unlikely that a rehearing would have changed the outcome of the appellate decision.   It is also interesting to note that Defendant fails to describe any event in his reply that would constitute evidence that he was "provoked anew."   Therefore, because Defendant fails to show that the result of his appeal would have been any different but for

his counsel's alleged error, the Court recommends that this claim be denied.  *See Rhodes*, 1998 WL 480138 at *2 (finding that, because the appellant failed to show that the result reached by the Tenth Circuit was incorrect and that his petition for rehearing should have been granted, his counsel was not ineffective for failing to move for a rehearing).

### 10.   *Claim That Mr. Baiamonte Was Ineffective Regarding the Application of § 3147(1)*

Defendant next claims that Mr. Baiamonte was ineffective because he did not object to the Court's application of 18 U.S.C. § 3147 at his sentencing and failed to raise the issue on appeal. [*Doc. 1-2* at 20-21].  Defendant cites to the application note for U.S.S.G. § 3C1.3, which states that § 3147 requires that a sentence of imprisonment for committing a crime on release must be imposed in addition to the sentence of imprisonment imposed for the underlying offense and it must run consecutively to any other sentence of imprisonment.  *Id.*  He further argues that the Court was required to apportion the sentence for the crime and the sentence for the enhancement in the judgment and sentence.  *Id.*  Defendant contends that his counsel erred by failing to object when the Court failed to apply a sentence of imprisonment for § 3147, and states that, if his counsel had objected to this error, Defendant would not have been exposed to a sentence of life imprisonment.  *Id.* at 22.  Defendant contends that his underlying counsel was ineffective for failing to raise this issue either in his underlying criminal case or on appeal.  *Id.* at 22-23.

In response, the Government states that the Court did not err in its sentencing because, if the Court had imposed an additional term of imprisonment pursuant to § 3147(1), the Court would have exceeded the maximum statutory penalty for second degree murder, which could have implicated the holding in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a

jury, and proved beyond a reasonable doubt."   [*Doc. 32* at 38].   The Government further contends that the Court could not have apportioned Defendant's life sentence between § 3147 and the underlying crime by sentencing Defendant to a certain number of months imprisonment for § 3147 and a certain number of months for the underlying crime because that would not result in a life sentence.   *Id.*   The Government also contends that Defendant is procedurally barred from raising this issue in his § 2255 proceeding.   *Id.* at 39.   Finally, the Government contends that, even if the Court committed a procedural error in calculating or applying § 3C1.3, the error would be subject to plain error review because there was no objection made at the sentencing hearing. *Id.* at 40.

First, the Court finds that Defendant is not procedurally barred from raising this claim because he is not challenging the Court's error, but is challenging his counsel's failure to raise the issue at sentencing.   *See United States v. Harrison*, No 09-7113, 375 Fed. Appx. 830, 834, 2010 WL 1225617 (10th Cir. March 31, 2010) (unpublished) (finding that the district court erred in finding that the claimant was procedurally barred from raising issues regarding his sentencing when they were not raised on direct appeal because the claimant was not challenging the district court's alleged error, but instead was challenging his attorney's failure to raise the issues at sentencing).   Nevertheless, the Court finds that Defendant has failed to show that the outcome of his case would have been any different but for his counsel's alleged error.   As the Government explains, the Court sentenced Defendant to life imprisonment, which is within the statutory penalty for second degree murder pursuant to 18 U.S.C. § 1111(b) and within the recommended

guideline imprisonment range in Defendant's Presentence Report ("PSR").[8]   [*Doc. 32* at 37]. The Government also explained that the Court believed that if it were to impose any term of imprisonment consecutive to the life sentence, it would have to depart upward from the guidelines range, so the Court chose not to impose a sentence for the § 3147(1) enhancement.   *Id.* at 38. Defendant admits that the "court chose not to impose enhancement under 18 U.S.C. [§] 3147(1) because the sentence was life."   [*Doc. 1-1* at 2].   Additionally, Defendant does not challenge the length of his sentence under § 1111 but, rather, challenges the Court's failure to impose an additional term of imprisonment under § 3147 or to apportion his life sentence between the two statutes.   However, any possible error in the Court's application of § 3147 would not affect the Sentencing Guidelines range of Defendant's sentence, so there was no prejudice to Defendant for the alleged error.   *See, e.g., United States v. Shea*, Nos. 12-1190, 12-1191, 493 Fed. Appx. 792, 795, 2012 WL 4373430 (7th Cir. Sept. 26, 2012) (unpublished) (finding that there was no plain error when the possible errors in the court's application of sentencing enhancements did not affect the defendant's guidelines range).   Moreover, Defendant provides no support for his contention that he would not have received a life sentence but for his counsel's alleged error.   The Court, therefore, recommends that this claim be denied.

### *11.   Cumulative Error Claim*

Defendant's final claim is that Mr. Baiamonte's alleged cumulative errors resulted in ineffective assistance of counsel.   [*Doc. 1-2* at 24].   Specifically, Defendant contends that Mr. Baiamonte erred by: (1) failing to object to the Court's failure to instruct the jury that the Government had the burden to prove lack of passion as an element of the murder charge (*id.*

---

[8] It is the Court's practice to not file confidential PSRs on the Court's CM-ECF docket, and neither party provided a copy of the PSR in their submissions.   The Court has determined that its review of the PSR is not necessary for the Court's determination of Defendant's Section 2255 motion inasmuch as neither party disputes the content of the PSR.

at 24-26); (2) "fail[ing] to develop a level of professional communication that ensured that [Mr.] Baiamonte obtained the information necessary to ably defend [Defendant] in an effective manner" (*id.* at 27-28 and *Doc. 1-3* at 1); and (3) failing to request an extension of the trial to explore defense options when Mr. Baiamonte took over from prior counsel (*Doc. 1-3* at 1-2).   In response, the Government denies that Mr. Baiamonte was ineffective for any of these reasons, specifically because: (1) there was not sufficient evidence to present a "heat of passion defense" (*Doc. 32* at 41-44); (2) Defendant fails to show how the communication between Defendant and Mr. Baiamonte affected Mr. Baiamonte's performance at trial (*id.* at 44-48); and (3) Defendant fails to show how he was prejudiced by Mr. Baiamonte failing to ask for a continuance of the trial (*id.* at 48-49).

The Court finds that this claim is without merit.   First, the Tenth Circuit found that there was no error in failing to instruct the jury regarding a "heat of passion" defense to the second degree murder charge.   *See Jack*, 483 Fed. Appx. 428 ("Having thoroughly reviewed the record, however, we conclude there was insufficient evidence to support a heat of passion defense in this case.").   The Court has already found that Mr. Baiamonte was not ineffective for failing to pursue the defense because Defendant has made no showing that there are any facts that would support such a defense.   *See* Section A.3., *supra*.   This claim, therefore, is without merit.

Second, Defendant's allegations that that Mr. Baiamonte was uncommunicative are insufficient to support a claim of ineffective assistance of counsel.   Defendant claims that Mr. Baiamonte: (1) told Defendant that Defendant was guilty of murder; (2) demanded that the United States Marshals use a shock box while Defendant was in court; (3) told Defendant he hoped Defendant would die in prison; (4) would not listen to strategies and information Defendant

developed with his previous counsel; (5) caused Defendant to miss out on a plea offer from the Government; (6) caused Defendant to not be able to get exculpatory evidence admitted at trial; (7) caused Defendant to not be able to develop a viable defense; and (8) caused Defendant to not be able to file a timely petition for rehearing with the Tenth Circuit.   [*Doc. 1-2* at 27-28] and [*Doc. 1-3* at 1].   Defendant fails to provide support that Mr. Baiamonte's alleged failures affected the outcome of Defendant's case or that Mr. Baiamonte failed to raise any meritorious arguments. *See Hall*, 935 F.2d at 1110 (*pro se* litigant must allege "sufficient facts on which a recognized legal claim could be based," and "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based") and *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (holding that counsel's failure to raise meritless issue in underlying criminal case did not constitute ineffective assistance).   The Court, therefore, finds that these allegations are without merit.

Finally, the Court finds that Defendant's claim that Mr. Baiamonte erred by failing to ask for a continuance of the trial is without merit.   Defendant contends that he was prejudiced by this alleged error because Mr. Baiamonte did not prepare jury instructions regarding the voluntary manslaughter defense until the second day of trial.   [*Doc. 1-3* at 1-2].   Defendant fails to show how this prejudiced the outcome of his case since it is clear that the Court instructed the jury on voluntary manslaughter (*see Doc. 66*, filed in Case No. CR-09-2626, at 6) and, therefore, the Court finds that the claim is without merit.   Because the Court has found that these three ineffective assistance of counsel claims are without merit, the Court recommends that Defendant's cumulative error claim be denied.

**B.   Motions for Discovery, an Evidentiary Hearing, and Release to a Halfway House**

Defendant has filed two motions for an evidentiary hearing [*Docs. 2* and *7*], four motions for discovery [*Docs. 8, 9, 26* and *30*], and a motion to be released to a halfway house [*Doc. 37*].   In his discovery motions, Defendant asks for: (1) all materials in Mr. Baiamonte's and the Government's possession related to Defendant's case (*Doc. 8*); (2) phone records regarding a phone conversation Defendant had with Mr. Butcher (*Doc. 9*); (3) permission to submit questions to Mr. Butcher to aid Defendant in his § 2255 habeas motion (*Doc. 26*);[9] and (4) a Court-ordered affidavit from the state's medical examiner, Dr. Mock, to assist Defendant in his § 2255 motion (*Doc. 30*).   A movant under § 2255 is not entitled to discovery as a matter of course.   Under Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Court may authorize discovery only upon a showing of "good cause."   Good cause is established if a habeas petitioner makes specific allegations that give the Court "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief[.]"   *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (citation and internal quotation marks omitted).   Here, Defendant has made no showing that any of the discovery he seeks would demonstrate that he is entitled to relief.   Therefore, the Court recommends that his requests for discovery be denied.

In addition, the Court finds that an evidentiary hearing is unnecessary because Defendant's motion and the record of this case conclusively show that Defendant is entitled to no relief.   The Court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and

_____

[9] The Court notes that Mr. Butcher's affidavit, which is attached to the Government's response to the § 2255 motion, states that both parties have submitted questions to him, and he provides answers to the questions posed to him by Defendant.   *See* [*Doc. 32-3* at 1 and 10-11].   Defendant's motion to submit questions to Mr. Butcher may, therefore, be moot.   Nevertheless, the Court finds that Defendant has not shown that he is entitled to the discovery sought in Document 26, and will deny the motion, as further set forth below.

records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C.
§ 2255(b).   Therefore, the Court recommends that Defendant's motions for an evidentiary hearing
be denied.

Finally, Defendant asks the Court to release him to a halfway house because he has proven
that he is not a flight risk or a safety threat and that he is likely to be successful in his § 2255
motion.   [*Doc. 37*].   A motion seeking modification of the manner in which a sentence is being
executed is not properly brought in a § 2255 motion and, instead, is determined by the Bureau of
Prisons, not this Court.   Therefore, the Court recommends that this motion be denied.

## Conclusion

**IT IS HEREBY RECOMMENDED,** for the reasons stated above, that Defendant's
motion to supplement authority [*Doc. 36*] be **GRANTED**, the claims raised in Defendant's § 2255
motion [*Doc. 1*] be **DENIED**, Defendant's motions for an evidentiary hearing, for discovery, and
to be released to a halfway house [*Docs. 2, 7, 8, 9, 26, 30* and *37*] be **DENIED**, and that Case No.
CIV-13-0738 be **DISMISSED with prejudice**.

**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**